# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE ESTATE OF JACKSON LEE SRADER,
a deceased minor, by and through co-personal
representatives, JENNIFER SRADER and
TIM SRADER, and as parent and next friend of
R.S., a minor, and JENNIFER SRADER
and TIM SRADER, individually,

        Plaintiffs,

v.                                  No. 23-CV-32 MV/SCY

THE UNITED STATES OF AMERICA,
ROBERT MILLS, RN and
RAQUEL R. RAMAL, RNC-MNN,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Defendant United States' Motion to Dismiss in Lieu of Answer ("Government's Motion") [Doc. 13] and Defendant Robert Mills, RN's Motion to Dismiss in Lieu of Answer ("Nurse Mills's Motion") [Doc. 50]. The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the Government's Motion is well-taken only in part and will be granted only in part, and Nurse Mills's Motion is well-taken and will be granted, although Plaintiffs will be given an opportunity to file a motion seeking leave to amend as to Nurse Mills.

## BACKGROUND

On May 12, 2020, Lisa Curtis, Esq., submitted three administrative tort claim forms to the United States Department of Health and Human Services ("HHS"), on behalf of Jennifer Srader, in her individual capacity, Timothy Srader, in his individual capacity, and Jennifer and Timothy Srader, as Personal Representatives for the Estate of Jackson Lee Srader ("Jackson"). Doc. 13-1. Each of the claims included a Standard Form 95 ("SF-95"). *Id.* On each SF-95, under

"Amount of Claim," in the box labeled "Wrongful Death," an amount $15,000,000.00 was listed. Doc. 13-2 at 2, 4, 6. In the box labeled, "Total," the amount of $15,000,000.00 was again listed. *Id.*

Each of the claims also included an attachment detailing the facts on which the claim was based. *Id.* The attachments to the three SF-95s were identical and provided the following recitation of events. Mrs. Srader originally sought prenatal care at Northern Navajo Medical Center ("NNMC") on May 11, 2020. At her visit, she had a fetal ultrasound, which established a gestational age of 11 weeks, 1 day, with reassuring fetal status, and an estimated date of birth of November 20, 2020. This was her third pregnancy. She had one living child and had suffered one miscarriage.

Eight days later, on May 19, 2020, Mrs. Srader experienced light vaginal bleeding, without clots but with lower abdominal cramping and lower back pain. As a result, Mrs. Srader went to the Emergency Department at NNMC. Because of COVID restrictions, Mrs. Srader's husband, Mr. Srader, was unable to accompany her.

In the Emergency Department, Dr. Attebery examined Mrs. Srader and completed a physical examination, which found minimal dark red blood in vaginal vault – cervix 1 cm dilated and no active bleeding. Dr. Attebery did not order any laboratory tests or an ultrasound. Her "medical decision-making and plan stated, '[Patient] with vag[inal] bleeding and open os, inevitable miscarriage. She is very stressed and anxious and traumatized from her previous miscarriage." Dr. Atteberry then consulted with Dr. Moore from the OBGYN Department, who "reviewed the patient's chart and asked that the patient be sent to her clinic now and she will see the patient."

2

Without confirming through an ultrasound that the fetus was dead or compromised, Dr. Moore performed a manual vacuum aspiration of the uterus. After the procedure, she did not order an ultrasound to confirm that the uterus was empty. Dr. Moore's notes state, "uterine contents evacuated, no active bleeding, uterus contracted. Doxycycline post procedure."

Thereafter, Mrs. Srader's vaginal bleeding became heavier and was accompanied by cramping. On June 10, 2020, she called the OBGYN Department at NNMC and reported that she was changing menstrual pads hourly. She spoke with Nurse Ramal, who advised her to monitor her bleeding. Nurse Ramal did not advise Mrs. Srader to come in to be examined.

On July 7, 2020, Mrs. Srader's abdominal pain intensified and radiated to her back. She was nauseous and was experiencing green vaginal discharge. She returned, alone, to NNMC Emergency Department. Mrs. Srader was found to be septic from chorioamnionitis, a life-threatening uterine infection. An ultrasound was performed, which showed that her fetus was still alive: there was a fetal heart rate, and the gestational age was determined to be between 17 weeks, 1 day, and 19 weeks, 4 days. Mrs. Srader was able to hear the fetal heartbeat. As a result of the aspiration procedure that Dr. Moore had performed in May, however, the fetus had severe oligohydramnios, or little amniotic fluid, a compressed thorax, and a deformed skull. Providers at NNMC recommended that Mrs. Srader again undergo a procedure to terminate the pregnancy, because of the irreparable damage that the fetus had suffered. After multiple requests, staff allowed Mr. Srader to join Mrs. Srader at NNMC. Mr. Srader and Mrs. Srader requested a second opinion and referral to a specialty service, hoping to save their baby.

The next day, Mrs. Srader was transported by American Medical Response to the University of New Mexico Hospital in Albuquerque, New Mexico. She was admitted to the Obstetrics Department for preterm previable rupture of membranes with a fetus with a heartbeat

3

and complete oligohydramnios. She was presumed to be suffering from chorioamnionitis in the context of maternal Systemic Inflammatory Response Syndrome ("SIRS"). Mrs. Srader had to choose between being induced and giving birth to a previable fetus or having a dilation and forced evacuation of the fetus, either of which would result in the death of the fetus. Mrs. Srader elected to deliver the fetus. Thereafter, surgical management (dilation and curettage) was required to remove the placenta because of the chorioamnionitis. She stayed in the hospital overnight, and was discharged on July 10, 2020, distraught and in mourning. The body of her baby, whom she named Jackson, was released on July 11, 2020.

As a result of the failure to conduct an ultrasound, a physical exam, or laboratory tests before or after performing the manual aspiration of her uterus, Mrs. Srader suffered illness, pain and suffering, the unnecessary loss of her child, and a compromised ability to have children in the future. She subsequently sought and received grief counseling services to assist in coping with her pregnancy loss and removal, failed removal of pregnancy, and subsequent life-threating infection and a repeat loss of the pregnancy.

Because they were not signed, the administrative tort claims filed by Ms. Curtis on May 12, 2022, were defective. Doc. 13-1. Ms. Curtis and Melanie Ben, Esq., submitted three new tort claims to HHS on May 18, 2022, with signed SF-95s that did not include, but incorporated by reference, the attachments to the original claims. *Id.* Other than adding their clients' signatures, the SF-95 Forms were filled out in the same way as the original forms had been. Doc. 13-3 at 2, 4, 6.

When HHS failed to respond with a denial of these claims within the relevant time period, Plaintiffs Jennifer Srader, Tim Srader, Jackson's Estate (by Jennifer and Tim Srader as Personal Representatives), and Jennifer and Tim Srader as parents and next friends of R.S., a

minor, through their attorneys Ms. Curtis and Ms. Ben, commenced the instant medical

malpractice action under the Federal Tort Claims Act ("FTCA"). In their First Amended

Complaint to Recover Damages for Wrongful Death and Loss of Consortium Arising from

Medical Negligence ("FAC"), Doc. 3, Plaintiffs cite 28 U.S.C. § 1346(b)(1) as the source for this

Court's jurisdiction over this action. That provision creates jurisdiction in the federal district

courts for damages claims against the United States for "personal injury or death caused by the

negligent or wrongful act or omission of any employee of the Government while acting within

the scope of his office or employment, under circumstances where the United States, if a private

person, would be liable to the claimant in accordance with the law of the place where the act or

omission occurred." 28 U.S.C. §1346(b)(1).

Originally, Plaintiffs named as defendants NNMC, HHS, Indian Health Service ("IHS"),

the United States of America, Adrienne Moore, M.D., Suzanne J. Atterberry, DO, Reanne Irvin,

RN, Robert Mills, RN, and Raquel R. Ramal, RNC-MNN. Upon the United States' Motion for

Order Dismissing Federal Hospital and Agency Defendants and Amending Caption, Doc. 14, the

Court entered an order dismissing NNMC, HHS, and IHS from this action. Doc. 65. Similarly,

upon the appropriate certification that Dr. Moore, Dr. Attebery, and Nurse Irvin were "federal

employees or federal contractors," Doc. 12-1, Ex. A, and upon the United States' Motion for

Order Upon Notice of Entry of Substitution of Adrienne Moore, M.D., Suzanne J. Attebery, DO,

and Reanne Irvin, Doc. 12, the Court entered an order substituting the United States as

Defendant in place of Dr. Moore, Dr. Attebery, and Nurse Irvin. Doc. 64. As there was no

similar certification as to Nurse Mills or Nurse Ramal, they remain as named defendants in this

matter. Notably, the FAC does not identify the claims against Nurse Mills and/or Nurse Ramal as

arising solely under state law, or as being supplemental in nature. Nonetheless, "governing

authority supports the general proposition that a plaintiff may assert state-law claims pursuant to 28 U.S.C. § 1367 in a case where federal jurisdiction is premised upon claims against the United States arising under the FTCA." *Ressel v. United States*, 23-CV-627, 2025 WL 2810978, at *2 (W.D. Okla. Sept. 29, 2025). Accordingly, the Defendants currently in this action are the United States, Nurse Mills, and Nurse Ramal, the claims against the United States arise under the FTCA, and the claims against Nurse Mills and Nurse Ramal are pendent state law claims.

Plaintiffs' FAC sets forth facts virtually identical to those detailed in the attachments to their administrative claims. *Id.* ¶¶ 1-30. Accordingly, the FAC states in relevant part that Dr. Attebery saw Mrs. Srader when she first came to NNMC on May 19, 2020, and that, after Dr. Attebery consulted with Dr. Moore, Dr Moore performed the manual vacuum aspiration of Mrs. Srader's uterus, without first, or subsequently, performing a proper physical exam, an ultrasound, or laboratory tests. *Id.* ¶¶ 5, 7-8, 10-13. The FAC further states that when Mrs. Srader called NNMC on June 10, 2020, she spoke with Nurse Ramal, who advised her only to monitor her bleeding instead of advising her to come in and be examined. *Id.* ¶¶ 16-17. The only individuals at NNMC identified by Plaintiffs as having seen, spoken to, or treated Mrs. Srader are Dr. Attebery, Dr. Moore, and Nurse Ramal. Plaintiffs do not allege any interactions between Mrs. Srader and Nurse Mills, or any actions taken or omissions made by Nurse Mills; nor do they provide any factual basis to establish his role in, or responsibility for, any part of the chain of events on which Plaintiffs' claims are based.

Plaintiffs assert that Dr. Moore, Dr. Attebery, Nurse Irvin, Nurse Ramal, and Nurse Mills caused Mrs. Srader's "traumatic pain [and] suffering" and the "unnecessary death of the Srader's unborn baby," failed to "conduct any laboratory studies, fetal heart tones or ultrasound," and "did not possess or apply the knowledge and use the skill and care ordinarily used by reasonably

6

well-qualified health care providers of the same field of medicine practicing under similar circumstances, giving due consideration to the locality involved, thus breaching their duty to their patients Mrs. Srader and Baby Jackson." *Id.* ¶¶ 2, 9, 47. Although it contains numbered paragraphs, the FAC does not identify Plaintiffs' claims as separate counts or anywhere identify the causes of action they seek to pursue through this action. Despite its lack of organization and clarity, Plaintiffs appear to assert a wrongful death claim on behalf of Jackson's Estate, a personal injury claim on behalf of Mrs. Srader, loss of consortium claims on behalf of Mrs. Srader, Mr. Srader, and R.S. (Mr. and Mrs. Srader's son), and negligent hiring, training, supervision, credentialing, and privileging claims on behalf of Mrs. Srader. The FAC also seeks punitive damages against all Defendants and compensatory damages above the cap set by the New Mexico Medical Malpractice Act ("NMMMA"), even as to the United States.

The Government's Motion, which seeks dismissal of the FAC as against the United States pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of jurisdiction and denial of Plaintiffs' requests for both punitive damages and compensatory damages above the NMMMA cap, and Nurse Mills's Motion, which seeks dismissal of the FAC as against Nurse Mills pursuant to Rule 12(b)(6) for failure to state a claim, are now before the Court.

## LEGAL STANDARD

I.    Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress." *Henry v. Office of Thrift Supervision*, 43 F.3d 507, 511 (10th Cir. 1994) (citations omitted). Plaintiffs bear the burden of establishing this Court's jurisdiction over their claims. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). Before

7

considering the merits of a case, the Court is responsible for ensuring that it has subject matter jurisdiction. *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992).

Under Rule 12(b)(1), a party may assert by motion the defense of the Court's "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Motions to dismiss for lack of subject matter jurisdiction "take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which the subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). On a facial attack, the Court considers the complaint's allegations to be true. *Id.* On the other hand, when the motion challenges the factual basis for an action, the Court "may not presume the truthfulness of the complaint's factual allegations." *Campos v. Las Cruces Nursing Ctr.*, No. 11-CV-0096, 2011 WL 5238921, *4 (D.N.M. Sept. 30, 2011) (citation omitted). Rather, the "court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* Reference to evidence outside the pleadings does not convert the motion to a summary judgment motion. *Id.*

When jurisdictional issues raised in a Rule 12(b)(1) motion are intertwined with the case's merits, the Court looks to the Rule 12(b)(6) standard to resolve the motion. *Franklin Sav. Corp v. United States,* 180 F.3d 1124, 1129-30 (10th Cir. 1999). The jurisdictional question is considered intertwined with the merits of the case when the Court's subject matter jurisdiction is conditioned upon the same statute that provides the substantive claim in the case. *See Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976, 978 (10th Cir. 2002). The Tenth Circuit has held that "the determination of whether the FTCA excepts the government's action from its waiver of sovereign immunity involves both jurisdiction and merits issues" and therefore should be

8

resolved under Rule 12(b)(6). *Bell v. United States,* 127 F.3d 1226, 1228 (10th Cir. 1997).

II.       Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

Under Rule 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). When considering a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009), *cert. denied*, 558 U.S. 1148 (2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

The Court in *Iqbal* identified "two working principles" in the context of a motion to dismiss. *Id.* First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. "Second, only a complaint that states a plausible claim for relief survives a motion to

9

dismiss." *Id.* at 679; *see Twombly*, 550 U.S. at 570 (holding that a plaintiff must "nudge" her claims "across the line from conceivable to plausible"). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* (citation omitted).

In keeping with these two principles, the Court explained,

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Id.* at 679. In a complaint asserting "complex claims against multiple defendants, it is 'particularly important' to 'make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations.'" *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Assoc.*, 691 F. App'x 515, 519 (10th Cir. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.,* 519 F.3d 1242, 1250 (10th Cir. 2008)).

I.    The Government's Motion

A.    Personal Injury Claim

In the FAC, Mrs. Srader asserts a personal injury claim based on medical negligence, alleging that Dr. Moore's performance of a manual vacuum aspiration, after which "Mrs. Srader was sent home without any examination or tests to verify the outcome," "invariably led to Mrs. Srader's illness, pain and suffering." Doc. 3 ¶¶ 29, 30. Plaintiffs state that Defendant NNMC, "through its physician assistants, midwives, nurses, and healthcare providers, failed to use the skill and care ordinarily used by reasonable well qualified physicians, physician assistants, midwives, nurses, and healthcare providers in their area of specialty in their care, evaluation,

10

treatment, diagnosis, and operating on Mrs. Srader . . . which resulted in . . . Mrs. Srader's injuries and damages," and which "breach[ed] their duty" to their "patient" Mrs. Srader. *Id.* ¶¶ 45, 47. As a result of this "negligence by Defendants," Plaintiffs assert that they are entitled to recover any "damages available by law." *Id.* ¶ 49.

As asserted against the United States, this personal injury claim is "predicated on the United States' waiver of sovereign immunity under the FTCA." *Ayala v. United States*, 49 F.3d 607, 610 (10th Cir. 1995). The FTCA "waive[s] the sovereign immunity of the United States for certain torts[, including negligence resulting in injury or death,] committed by federal employees acting within the scope of their employment." *Brownback v. King*, 592 U.S. 209, 212 (2021) (citations omitted). The FTCA waiver, however, contains notice requirements that "must be strictly construed," and "are jurisdictional and cannot be waived." *Estate of Trentadue v. United States*, 397 F.3d 840, 852 (10th Cir. 2005) (citation omitted). Specifically, 28 U.S.C. § 2675(a) "requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim." *Id.* (citations omitted). The purpose of the notice requirements is to provide the government with the "opportunity to settle [] potential claim[s] without litigation." *Lopez v. United States*, 823 F.3d 970, 977 (10th Cir. 2016).

The Tenth Circuit has made clear that these "notice requirements should not be interpreted inflexibly." *Trentadue*, 397 F.3d at 853. Rather, the court must take a "pragmatic" approach: "as long as the language of the administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought, it fulfills the notice-of-claim requirement." *Id.* (citations omitted). The focus of the notice requirement thus is a "facts-and-circumstances" one: "the

11

notice must describe the facts and circumstances underlying a claim rather than the exact grounds upon which [the] plaintiff seeks to hold the government liable." *Benally v. United States*, 735 F. App'x 480, 485 (10th Cir. 2018). Accordingly, "an FTC notice should be read to encompass[] any cause of action fairly implicit in the facts." *Id.* (quoting *Lopez*, 823 F.3d at 977). Importantly, "no statement of legal theories is required by Form SF95, only facts plus a demand for money." *Lopez*, 823 F.3d at 977. Thus, "courts should liberally construe the universe of facts that the FTCA claimant provides." *Benally,* 735 F. App'x at 485.

The government argues that Plaintiffs failed to provide adequate notice of Mrs. Srader's personal injury claim because her SF-95 did not include an amount in the box labeled, "Personal Injury." Doc. 13 at 8-10. Mrs. Srader's SF-95 listed a damages amount of $15,000,000.00 in the box labeled, "Wrongful Death," and listed that same amount in the box labeled, "Total," but did not list any amount in the box labeled, "Personal Injury." Doc. 13-1. According to the government, because she "only included a sum certain for wrongful death," Mrs. Srader failed to meet the jurisdictional notice requirements as to her personal injury claims, warranting their dismissal. Doc. 13 at 8, 10.

The government's argument calls on the Court to take an inflexible, rather than a pragmatic, approach to interpreting the notice requirements, and thus runs contrary to controlling precedent. The Tenth Circuit has made clear that the FTCA requires only "facts plus a demand for money." *Lopez*, 823 F.3d at 977. Mrs. Srader's SF-95, read together with the attachment thereto, provides both.

First, the attachment "provides the facts and circumstances underpinning her subsequent federal-court [personal injury] claim." *Benally*, 735 F. App'x at 488. Specifically, the attachment provides a detailed account of the treatment decisions made and procedures performed by

medical staff at NNMC when Mrs. Srader sought care for "light vaginal bleeding." The attachment explains how, without first ordering blood tests or an ultrasound, Dr. Moore performed a manual vacuum aspiration of the uterus, which caused life-threatening trauma to Mrs. Srader's fetus but did not actually remove it from her uterus. Dr. Moore was unaware of this, however, because she sent Mrs. Srader home without performing an ultrasound to confirm that the uterus was empty. The attachment further explains that, having been left with a damaged fetus inside her uterus, Mrs. Srader experienced heavy bleeding and cramping, which she reported to NNMC; no one there advised her to come to the clinic to be examined. Finally, the attachment explains that, as a result of Dr. Moore's treatment decisions, Mrs. Srader became incredibly ill with a life-threatening uterine infection and ultimately delivered a previable fetus who was unable to survive.

These facts, which are the same facts alleged in the FAC, support Mrs. Srader's claim that NNMC and its providers breached their duty to her to "conform to the recognized standard of medical practice in the community," proximately causing her injuries. *Bruton v. United States*, No. 11-CV-330, 2014 WL 12479990, at *2 (D.N.M. July 2, 2014). Accordingly, the language of Mrs. Srader's administrative claim "gave DOJ notice of the facts and circumstances surrounding [her medical negligence] claim." *Trentadue*, 397 F.3d at 853. "[M]oreover, this language "is consistent with Plaintiffs' subsequent allegations in their [FAC]." *Id.* "Thus, a government investigator would have had [an adequate] basis to inquire into the quality of [Mrs. Srader's] care." *Id.* Because a cause of action for medical negligence unquestionably is "fairly implicit in the facts" recited in the attachment to Mrs. Srader's SF-95, this Court, as it must, reads her administrative claim to encompass such an action. *Lopez*, 823 F.3d at 977.

Next, Mrs. Srader's SF-95 contains "a request for a sum certain in damages," namely,

$150,000,000, which is noted in both the "Wrongful Death" box and the "Total" box. *Id.* The Court is perplexed as to why Mrs. Srader's attorneys, experienced medical malpractice litigators, provided the factual basis for a personal injury claim in the attachment but did not note the $150,000,000 sum certain sought by Mrs. Srader in the "Personal Injury" box. Nonetheless, her notice both describes the facts and circumstances underlying her personal injury claim and makes clear that Mrs. Srader seeks a total amount of $150,000,000. Accordingly, "[i]n its totality, [Mrs. Srader's] SF-95 gave Defendants notice of the basis of the underlying tort claims and the potential value of the claims." *Salas v. United States*, 787 F. Supp. 3d 799, 812 (W.D. Tex. 2025). Under these circumstances, the fact that the "Personal Injury" box was left blank does not render legally inadequate the notice of her personal injury claim. *See Salas*, 787 F. Supp. 3d at 811-12 ((holding that leaving the "Personal Injury" box of an SF-95 blank but including a sum certain in the "Total" box did not constitute a waiver of personal injury damages in an FTCA claim, where SF-95 "contained a narrative that included claims that [plaintiff] suffered 'pain and mental anguish'" and noted "that the total sum certain sought was $15,000,000"); *Carlo v. Bazing*, No. 22-CV-188, 2024 WL 964237, at *6-7 (D.N.M. Mar. 6, 2024) (finding sufficient exhaustion on loss of consortium claims where the only sum provided by plaintiffs was in the wrongful death section of their SF-95, but plaintiffs notified the government of the specific facts required for their loss of consortium claims); *see also McDonald v. United States*, 582 F. Supp. 3d 682, 688-89 (D. Ariz. 2022) (rejecting government's argument that plaintiff could recover only the total of the amounts listed in each category on his SF-95, as opposed to the larger amount listed in the "Total" box, stating that "what matters is that the plaintiff sufficiently put the Federal agency on notice of the types of injuries and the claims at issue, and that the plaintiff provided a sum certain amount that indicates to the Federal agency its

14

maximum potential exposure to liability"); *Lopez v. United States*, 758 F.2d 806, 809-10 (1st Cir. 1985) (finding that administrative claim that asked for the sum of $850,000 for personal injuries but did not explicitly claim "mental damages" was sufficient to put the government on notice of mental injuries, thus allowing him to pursue a claim of mental injuries in his later federal complaint, where his administrative claim stated that he had experienced a brain concussion and post traumatic headache).

The cases cited by the government do not counsel a different conclusion, as they restate and rely upon the very principle applied here, namely that the salient question in determining the validity of an SF-95 is whether "the form [] give[s] constructive notice sufficient to warrant government investigation of each claim." *Haceesa v. United States*, 309 F.3d 722, 734 (10th Cir. 2002). Further, unlike Mrs. Srader's SF-95, in each of the cases cited by the government, the notice failed to set forth the facts underlying the challenged claim or describing the injury that a particular plaintiff had suffered. *See McNeese v. United States*, No. 10-CV-107, 2012 WL 1288644, at *3-4 (D.N.M. Jan. 23, 2012) (holding that the plaintiff's SF-95 form "would not have put the government on notice to investigate any loss of consortium claim" where the form "described the medical negligence suffered by her wife" but "did not describe her own injury" and thus failed to set forth any facts relevant to her own claim and, in addition, did not "claim a sum certain for personal injury damages"); *Skeet v. United States*, No. 10-CV-107, 2012 WL 12884644, at *3 (D.N.M. Jan. 23, 2012) (holding that, where administrative claims "made no reference whatsoever to loss of consortium, they did not serve to exhaust such a claim"); *Dukert v. United States*, No. 14-CV-506, 2016 WL 10721258, at *5-6 (D.N.M. Jan. 5, 2016) (finding failure to exhaust loss of consortium claim where there were "no facts" on the SF-95 that "could be construed to support an individual claim for loss of consortium, and the form did not allege

15

any personal injury money damages); *Staggs v. United States*, 425 F.3d 881, 884 (10th Cir. 2005) (finding administrative claim insufficient to implicate lack of informed consent where nothing in her claim suggested that she "consented to a course of treatment or remained on such a course without being informed of her options and the risks"). Accordingly, none of the cases cited by the government supports the proposition that leaving the "Personal Injury" box blank is alone sufficient to deprive this Court of jurisdiction, where the government has been put on notice of the facts and circumstances of Mrs. Srader's medical negligence claim and of its maximum potential exposure to liability.

For these reasons, Mrs. Srader's SF-95 provided sufficient notice of her personal injury claim to meet the requirements of § 2675(a). The Court thus has subject matter jurisdiction over that claim. Accordingly, the Court will allow Mrs. Srader's personal injury claim to proceed against the United States.

B.      Wrongful Death Claim

In the FAC, Plaintiffs assert that Jackson, "a previable baby" with a gestational age of "12 weeks 2 days" at the time that Mrs. Srader first went to NNMC on May 19, 2020, "suffered a wrongful death" "as a direct and proximate result of [Defendants'] negligence and breaches of the standard of care . . . to properly care for, evaluate and treat" both Mrs. Srader and Jackson. Doc. 3 ¶¶ 7, 26, 39, 43. As a result, Plaintiffs assert that they "are entitled to recover damages leading up to and resulting in [] Jackson [] Srader's wrongful death." *Id.* ¶ 40.

As with Mrs. Srader's personal injury claim, the Estate of Jackson's wrongful death claim as asserted against the United States "is predicated on the United States' waiver of sovereign immunity under the FTCA." *Ayala*, 49 F.3d at 610. Relevant here, the FTCA waiver applies only in "circumstances where the United States, if a private person, would be liable to the

16

claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 (stating that the United States is liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances"). Accordingly, "the government is not liable under the FTCA unless state law recognizes a comparable liability for private persons." *Ayala*, 49 F.3d at 611. The court therefore must "look to the law of the state in which the alleged tortious activity occurred to resolve questions of liability under the FTCA," *id.*, which here is New Mexico. Doc. 3 ¶ 63. If the alleged tortious activity has no "private person analogue under New Mexico law," the federal court lacks subject matter jurisdiction over the claim. *Poncho-Alderete v. United States*, 22-CV-153, 2024 WL 2132394, at *11-12 (D.N.M. May 8, 2024) (citing *Brownback*, 592 U.S. at 217-18; *United States v. Agronics*, 164 F.3d 1343, 1346 (10th Cir. 1999)); *see also Murphy v. United States*, 20-CV-557, 2020 WL 6939716, at *3 (D.N.M. Nov. 25, 2020) ("Determining whether the alleged facts in Plaintiff's complaint establish the requisite private person analog for jurisdiction requires the Court to resolve whether New Mexico law would hold a private person similarly situated to the [government employees] negligent based on the alleged facts.").

In determining whether this Court has subject matter jurisdiction over Plaintiffs' wrongful death claim, the Court thus must determine whether New Mexico law would allow such a claim to proceed against a private person similarly situated to NNMC and its doctors and nurses based on the facts alleged in the FAC. "The [Wrongful Death] Act is the exclusive remedy governing wrongful death actions in New Mexico." *Romero v. Byers*, 872 P.2d 840, 845 (N.M. 1994). Under that Act, an action for damages may be maintained if "the death of a *person*" was "caused by the wrongful act, neglect or default of another" and such "wrongful act, neglect or default "would, if death had not ensued, have entitled the party injured to maintain an

action and recover damages in respect thereof." N.M. Stat. Ann. § 41-2-1 (emphasis added). In *Miller v. Kirk*, the New Mexico Supreme Court addressed the specific question of "whether a nonviable fetus is a 'person' within the meaning of the Act." 905 P.2d 194, 195 (N.M. 1995). The Court answered that question in the negative, holding "that no cause of action exists for the wrongful death of a nonviable fetus." *Id.* at 197. Rather "[a]n independent wrongful death action for the death of a fetus requires a showing of viability at the time of injury." *Id.* "Viability is defined as '[t]hat stage of fetal development when the life of the unborn child may be continued indefinitely outside the womb by natural or artificial life-supportive systems.'" *Id.* (quoting *Black's Law Dictionary* 1565 (6th ed. 1990)). "Thus, a fetus is nonviable if it is incapable of sustaining life outside the mother's womb." *Id.*

Here, the facts as alleged by Plaintiffs establish that Jackson was "previable," or "nonviable," on May 19, 2020, when Mrs. Srader sought medical care at NNMC, Dr. Moore performed the manual aspiration of Mrs. Srader's uterus, and Mrs. Srader was sent home without further tests. Doc. 3 ¶ 7 ("Mrs. Srader was then 12 weeks 2 days pregnant"); ¶¶ 25-26 (describing Jackson as "previable"). At the time of the injuries caused by NNMC and its staff, Jackson was not at a "stage of fetal development when his life might have been continued indefinitely outside the womb by natural or artificial life-supportive systems." *Miller*, 905 P.2d at 195. It is undisputed that Jackson was "incapable of sustaining life outside [Mrs. Srader's] womb" at that time and, accordingly, was not a viable fetus. *Id.* Under *Miller*, Jackson thus would not qualify as a "person" within the meaning of the Wrongful Death Act. New Mexico law thus would not allow for a wrongful death action to be brought against a private person similarly situated to NNMC and its doctors and nurses.

Despite this clear New Mexico authority, Plaintiffs contend that they may pursue their

18

wrongful death action because, in *Dobbs v. Jackson Women's Health Org.*, the Supreme Court stated that legitimate state interests for laws regulating abortions include "respect for and preservation of prenatal life at all stages of development." 597 U.S. 215, 301 (2022). This statement, made in the entirely different and unrelated context of giving states the authority to regulate abortions, does not change the fact that New Mexico law does not allow a wrongful death action for a nonviable fetus. Plaintiffs provide no explanation for how this statement could or would upend binding New Mexico precedent as to the reach of its Wrongful Death Act. Indeed, in a state action brought by Plaintiffs herein against two of the Defendants herein, Nurse Mills and Nurse Ramal, the court addressed and rejected this very argument. *Estate of Jackson Lee Srader, et al. v. Mills, et al.*, No. D-117-CV-2023-00171 (1st Judicial Dist. Ct. Dec. 21, 2023). Citing *Miller,* the court found that "Plaintiffs cannot state a wrongful death cause of action for a non-viable fetus." *Id.* The court then specifically held that "*Dobbs* [] did not change the result required under New Mexico law." *Id.* The court thus dismissed with prejudice Plaintiffs' claim for wrongful death. *Id.* Plaintiffs provide no basis for this Court to reach a different conclusion.

Because no cause of action exists under New Mexico law for the wrongful death of a nonviable fetus, and because Jackson was a nonviable fetus at the time of the injury he suffered, Plaintiffs' wrongful death claim has no private person analogue under New Mexico law. Without a private person analogue, this Court lacks subject matter jurisdiction over Plaintiffs' wrongful death claim. Plaintiffs' wrongful death claim against the United States thus must be dismissed pursuant to Rule 12(b)(1).

    C.    <u>Loss of Consortium Claims</u>

Mr. Srader, Mrs. Srader, and R.S. assert loss of consortium claims based on Jackson's

tragic death. The FAC states that Mrs. Srader, Mr. Srader, and R.S. "have suffered a devastating loss from the wrongful death of their unborn child and brother," and are entitled to damages for the "loss of consortium" "attendant" to his "wrongful death." Doc. 3 ¶¶ 50, 49. As with the personal injury and wrongful death claims, these loss of consortium claims as asserted against the United States are "predicated on the United States' waiver of sovereign immunity under the FTCA." *Ayala*, 49 F.3d at 610.

As explained above, the FTCA's jurisdictional notice provision requires that a plaintiff exhaust administrative remedies before pursuing a federal court action. This requirement applies to each plaintiff individually: "[i]f there are multiple claimants in an FTCA case, each claimant must individually satisfy the jurisdictional prerequisite of filing a proper claim." *Haceesa*, 309 F.3d at 734. Here, Ms. Curtis and Ms. Ben submitted three administrative claim forms to HHS: one on behalf of Mrs. Srader in her individual capacity, one on behalf of Mr. Srader in his individual capacity, and one on behalf of Mr. and Mrs. Srader as Personal Representatives for Jackson's Estate. Puzzlingly, no administrative claim form was filed on behalf of R.S. Accordingly, R.S. did not meet the jurisdictional prerequisite of filing a proper claim. *Pipkin v. United States Postal Service*, 951 F.2d 272, 273 (10th Cir. 1991) (finding that plaintiff "completely failed to exhaust her administrative remedies" where she "never asserted any administrative claim on her own behalf"). His loss of consortium claim thus must be dismissed for lack of jurisdiction.

As to Mrs. and Mr. Srader, on whose behalf administrative claims *were* filed, the Court must determine whether their SF-95s provided sufficient notice of their loss of consortium claims. Loss of consortium is a "direct injury . . . to a relational interest with another who was physically injured [or died]," separate from the physical injury to [or death of] another."

20

*Thompson v. City of Albuquerque*, 397 P.3d 1279, 1284 (N.M. 2017); *see also Haceesa*, 309 F.3d at 734 (holding that relative of decedent must bring cause of action in her own individual capacity to recover loss of consortium damages). An action for loss of consortium is "to compensate [claimants for] an injury to a relationship they shared with the injured or deceased person." *Fitzjerrell v. City of Gallup*, 79 P.3d 836, 841 (N.M. Ct. App. 2003). To state a loss of consortium claim, the claimant must show "that the claimant and the injured party shared a sufficiently close relationship," and that the "tortfeasor owe[d] a duty of care to the claimant where it [was] foreseeable that the harm inflicted upon the injured party would damage the relationship between the injured party and the claimant." *Wachocki v. Bernalillo Cty. Sheriff's Dep't*, 265 P.3d 701, 703 (N.M. 2011).

The government argues that Plaintiffs failed to provide adequate notice of Mrs. and Mr. Srader's loss of consortium claims, both because the SF-95s did not include an amount in the box labeled, "Personal Injury," and because the attachment thereto "failed to describe facts that could have put the agency on notice of their individual claim of loss of consortium." Doc. 13 at 8-10, 11. As noted above, the SF-95s listed a damages amount of $15,000,000.00 in the box labeled, "Wrongful Death," and listed that same amount in the box labeled, "Total," but did not list any amount in the box labeled, "Personal Injury." Doc. 13-1. According to the government, because they "only included a sum certain for wrongful death," and because they failed to set forth facts underlying a loss of consortium claim, Mrs. and Mr. Srader failed to meet the jurisdictional notice requirements as to their loss of consortium claims, warranting their dismissal. Doc. 13 at 11-12.

As explained above in the context of Mrs. Srader's personal injury claim, the FTCA requires only "facts plus a demand for money." *Lopez*, 823 F.3d at 977. Mrs. and Mr. Srader's

21

SF-95s, read together with the attachments thereto, provide both.

First, the facts included in the attachment to the SF-95s submitted on behalf of Mrs. and Mr. Srader are sufficient to demonstrate a direct and foreseeable injury to the universally recognized relational interest between them, as parents, and Jackson, the child they were expecting. The attachment clearly and repeatedly refers to the sense of loss that they suffered due to the untimely and tragic death of their unborn child. Indeed, the attachment specifically states that Mrs. Srader "requested and received grief counseling services to assist her in coping with pregnancy loss and removal, failed removal of pregnancy, and subsequent life-threatening infection and a repeat loss of pregnancy." Doc. 13-2. The attachment further indicates that Mr. and Mrs. Srader "were stunned by the reality" that their baby was fatally wounded by the unnecessary and improperly performed manual aspiration procedure, and "went through [the] traumatic experience" of losing him because of that procedure. *Id.* These facts are sufficient to establish both that Mrs. and Mr. Srader shared a sufficiently close relationship with Jackson, and that it was foreseeable to NNMC and its medical staff that the harm inflicted on Jackson would damage the relationship between Jackson and his parents. *Wachocki*, 265 P.3d at 703.

These facts, which are the same facts alleged in the FAC, support Mrs. and Mr. Srader's claim that they "have suffered a devastating loss from the wrongful death of their unborn child." Doc. 3 ¶ 50. Accordingly, the language of Mrs. and Mr. Srader's administrative claims "gave DOJ notice of the facts and circumstances surrounding [their loss of consortium] claim." *Trentadue*, 397 F.3d at 853. "[M]oreover, this language "is consistent with Plaintiffs' subsequent allegations in their [FAC]." *Id.* "Thus, a government investigator would have had [an adequate] basis to inquire into" the injury to Mrs. and Mr. Srader's bond with Jackson. *Id.* Because a cause of action for loss of consortium is "fairly implicit in the facts" recited in the attachment to Mrs.

22

and Mr. Srader's SF-95s, this Court, as it must, reads their administrative claims to encompass such an action. *Lopez*, 823 F.3d at 977.

Next, as discussed in the context of Mrs. Srader's personal injury claim, Mrs. and Mr. Srader's SF-95s contain "a request for a sum certain in damages," namely, $150,000,000, which is noted in both the "Wrongful Death" box and the "Total" box. *Id.* As noted above, the Court is perplexed as to why their attorneys, experienced medical malpractice litigators, provided the factual basis for a loss of consortium claim, which falls under the umbrella of personal injury claims, in the attachment but did not note the $150,000,000 sum certain sought by Mrs. and Mr. Srader in the "Personal Injury" box. Nonetheless, their notices both describe the facts and circumstances underlying their loss of consortium claim and make clear that Mrs. and Mr. Srader seek a total amount of $150,000,000. Accordingly, "[i]n [their] totality, [the] SF-95[s] gave Defendants notice of the basis of the underlying tort claims and the potential value of the claims." *Salas*, 787 F. Supp. 3d at 812. Under these circumstances, the fact that the "Personal Injury" box was left blank does not render legally inadequate the notice of their loss of consortium claims.

The cases cited by the government do not counsel a different conclusion. As described above, those cases restate and rely upon the very principle applied here, namely that the salient question in determining the validity of an SF-95 is whether "the form [] give[s] constructive notice sufficient to warrant government investigation of each claim." *Haceesa*, 309 F.3d at 734. Further, unlike Mrs. and Mr. Srader's SF-95s, in each of the cases cited by the government, the notice failed to set forth the facts underlying the challenged claim or describing the injury that a particular plaintiff had suffered. *See supra.* Accordingly, none of the cases cited by the government supports the proposition that leaving the "Personal Injury" box blank is alone

23

sufficient to deprive this Court of jurisdiction, where the government has been put on notice of the facts and circumstances of Mrs. and Mr. Srader's loss of consortium claims and of its maximum potential exposure to liability.

For these reasons, Mrs. and Mr. Srader's SF-95s provided sufficient notice of their loss of consortium claims to meet the requirements of § 2675(a). The Court thus has subject matter jurisdiction over those claims. Accordingly, the Court thus will allow Mrs. and Mr. Srader's loss of consortium claims to proceed against the United States.

D.      Negligent Hiring, Training, Supervision, Credentialing, and Privileging Claims

In the FAC, Plaintiffs assert that the government breached its duty to Plaintiffs "by failing to properly operate the hospital in training and supervising their physicians and health care providers," namely, Dr. Moore, Dr. Attebery, Nurse Mills, Nurse Irvin, and Nurse Ramal. Doc. 3 ¶ 54. Plaintiffs similarly assert that the government breached its duty to Plaintiffs "in their failure of properly credentialing and privileging" Dr. Moore, Dr. Attebery, Nurse Mills, Nurse Irvin, and Nurse Ramal. *Id.* ¶ 55. As with the personal injury, wrongful death, and loss of consortium claims, these claims as asserted against the United States are "predicated on the United States' waiver of sovereign immunity under the FTCA." *Ayala*, 49 F.3d at 610.

Relevant here, the FTCA's waiver is limited by the discretionary function exception. Under the discretionary function exception, the government retains its immunity from claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). In *Berkovitz v. United States*, 486 U.S. 531 (1988), the Supreme Court established a two-part test for determining whether the challenged conduct falls within the discretionary function exception. *Knezovich v. United States*, 82 F.4th 931, 936 (10th Cir. 2023).

24

Under the first step of the *Berkovitz* test, the Court determines "whether the challenged conduct involves an element of judgment or choice, in which case it is discretionary and falls within the language of the exception." *Id.* at 937 (citations omitted). If, instead, the court finds at step one that "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the exception does not apply. *Kiehn v. United States*, 984 F.2d 1100, 1102 (10th Cir. 1993) (citation omitted). If, at step one, the court determines that the conduct involves discretionary judgment, the court must move on to step two "to determine whether that judgment is the kind that the discretionary function exception was designed to shield," as this exception "protects only those discretionary actions or decisions which are based on considerations of public policy." *Id.* Whether the exception applies to discretionary actions thus turns on whether the nature of those actions can be said to "implicate public policy concerns or [be] susceptible to public policy analysis." *Knewzovich*, 82 F.4th at 937. The Court must "presume that a government agent's discretionary actions are grounded in policy, and it is up to the challenger to allege facts showing that the actions were actually not policy-oriented." *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1222 (10th Cir. 2016).

Notably, the discretionary function exception applies "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Accordingly, "in applying the discretionary function exception, [the Court does] not consider whether the decision or nondecision was negligent or wrong." *Duke v. Dep't of Agriculture*, 131 F.3d 1407, 1410 (10th Cir. 1997). "[T]he question of negligence is irrelevant" when considering whether the discretionary exception applies. *Hurst v. United States*, No. 17-CV-189, 2018 WL 10529521, at *1 (E.D. Okla. Apr. 12, 2018).

Finally, "[t]he discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of [its] overall burden to establish subject matter

25

jurisdiction." *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998); *accord Knewzovich*, 82 F.4th at 927 ("Application of the discretionary function exception presents a threshold jurisdictional determination."). "If the challenged decision implicates [public policy] concerns, the discretionary function exception applies, and the district court lacks jurisdiction to consider the claim." *Id.*

### 1. Negligent Hiring, Supervision, and Training

To support Plaintiffs' negligent hiring, supervision, and training claims, the FAC does not identify any "discretion-constraining regulation or policy" applicable to NNMC's hiring, supervision, or training of its medical staff; nor do Plaintiffs present evidence of any such regulation or policy in response to the Government's Motion. *Sydnes v. United States*, 523 F.3d 1179, 1185 (10th Cir. 2008). In fact, although Plaintiffs include a heading in their Response that reads, "Negligent Hiring, Supervision and Training should not be Covered under the Discretionary Function Exception," the text that follows this heading addresses their credentialing and privileging claims, and makes no mention of their hiring, supervision, or training claims. Doc. 29 at 28-31. It is clear that "the burden under our case law to present evidence of a discretion-constraining regulation or policy resides with the plaintiffs." *Sydnes*, 523 F.3d at 1185. Plaintiffs have not met this burden and, accordingly, have failed to establish at step one of the *Berkovitz* test that NNMC's hiring, supervision, and training decisions were non-discretionary.

Nor do Plaintiffs attempt to demonstrate that the nature of NNMC's hiring, supervision, and training decisions were not "the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *United States v. Gaubert*, 499 U.S. 315, 329-30 (1991). Indeed, the Tenth Circuit has "previously and unqualifiedly held that decisions regarding employment . . .

26

are precisely the types of administrative action the discretionary function exception seeks to shield." *Sydnes*, 523 F.3d at 1185-86; *see also Richman v. Straley*, 48 F.3d 1139, 1146-47 (10th Cir. 1995) ("Decisions regarding employment and termination are inherently discretionary, especially where, as here, the relevant statutes provide no guidance or restrictions."); *Hurst v. United States*, No. 17-CV-189, 2018 WL 10529521, at *2 (E.D. Okla. Apr. 12, 2018) ("Federal appellate courts stand in agreement that decisions relating to the hiring, training, and supervision of employees are inherently a discretionary function," including "in the context of alleged medical malpractice"). The Tenth Circuit explained that "employment and termination decisions are, as a class, the kind of matters requiring consideration of a wide range of policy factors, including budgetary constraints, public perception, economic conditions, individual backgrounds, office diversity, experience and employer intuition." *Sydnes*, 523 F.3d at 1186.

In contexts analogous to the one here, "courts have held that staffing and operating procedures of an IHS clinic are administrative decisions grounded in economic, social, or political policies that are shielded by the discretionary function exception." *Two Eagle v. United States*, No. 20-CV-5054, 2022 WL 1243883, at *10 (D.S.D. Jan. 5, 2022); *Archambault v. United States*, 82 F. Supp. 3d 961, 965-66 (D.S.D. Jan. 5, 2015) (while "there is a broad mandate" to "provide health care to Native Americans," "[i]mplementation of that mandate," including "staffing and operating procedures," are "left to the discretion of the agencies charged with delivering the health care"). In an FTCA case alleging medical negligence at NNMC (the same facility at issue here), another court in this District held that NNMC's supervision of its medical staff was discretionary. *Begay v. United States*, No. 15-CV-0358, 2016 WL 6394925, at *30 (D.N.M. Sept. 30, 2016). The court explained that "while IHS has a mission to raise the physical, mental, social, and spiritual health of American Indians to the highest possible level,"

27

"IHS regularly finds it difficult to retain physicians to serve in the Navajo area." *Id.* For this reason, "IHS's local procurement officials [] must weigh a variety of financial, social, organizational, and logistical considerations when deciding which of is probationary physicians to retain." *Id.* The court applied the same reasoning to the negligent hiring claims before it, agreeing with the "[m]any district courts in all corners of the country [that] have come to the conclusion that a physician hired as an independent contractor falls within the scope of the discretionary-function exception." *Id.* at *31. Similarly, in an FTCA case involving the Gallup Indian Medical Center, the court found that the discretionary function exception barred the plaintiffs' negligent training claim, "because the manner in which a hospital trains its medical staff to care for premature babies generally appears to be a function that carries with it a large measure of discretion, and the plaintiffs have not identified . . . any statutes or regulations to the contrary." *Tolbert v. Gallup Indian Medical Center*, 555 F. Supp. 3d 1133, 1169 (D.N.M. 2021). The court explained that, "[i]n general, a hospital's training of its doctors and nurses involves substantial policy considerations," and in the case before it, "Gallup Medical may have considered several factors, including cost, the training their existing staff had received elsewhere, how regularly premature babies are born in the area that the hospital services, and how regularly full term babies are born in the area which the hospital services, when deciding what training regarding premature babies to provide its medical staff." *Id.* at 1170.

Given this precedent, coupled with their complete failure to address whether NNMC's hiring, supervision, and training decisions implicate public policy concerns, the Court finds that Plaintiffs have failed to meet their burden of establishing at step two of the *Berkovitz* test that the discretionary judgment inherent in those decisions is not "the kind that the discretionary function exception was designed to shield." *Kiehn*, 984 F.3d at 1102. Because the discretionary function

28

exception thus applies, this Court lacks jurisdiction to consider Plaintiffs' claims of negligent hiring, supervision, and training.

### 2.      Negligent Credentialing and Privileging

In their response brief in opposition to the Government's Motion, Plaintiffs argue that NNMC's credentialing and privileging decisions are not discretionary, but instead are "strictly regulated by federal statutes, regulations, and policy" that "impose mandatory requirements which allow no room for discretion." Doc. 29 at 20-21. While Plaintiffs cite and/or attach to their response brief various sources that they argue mandate non-discretionary conduct, none of those sources contain specific and mandatory directives that NNMC is alleged to have violated here.

First, Plaintiffs cite to and attach the Indian Health Manual ("IHM"). Doc. 29-6. The version of the IHM that they attach is not the version that was in effect during the relevant period, but rather a draft that was never implemented, and thus does not have the force and effect of a mandatory federal policy. *See* Doc. 32-1 ¶¶ 9-11. The version that *was* in effect during the relevant time-period contains the following mandatory language regarding privileging: "Members of the medical staff and others who must apply for clinical privileges must hold an active and unrestricted State license, certification, or registration, as applicable to practice in their professional field." Doc. 32-2 at 6 ((I.H.M. § 3-1.4(C)(5)). While this provision indicates that, "[i]n general, providers with any restrictions on any State license, certification, or registration will not be granted medical staff membership or clinical privileges," it qualifies this general rule, indicating that "exceptions may be granted on a case-by-case basis by the Area Director." *Id.*

In *Begay* and *Tolbert*, another court in this district interpreted this provision as a mandatory regulation, as it "does not leave those making [] credentialing decisions with an

element of choice or judgment." *Begay*, 2016 WL 6394925, at * 31; *Tolbert*, 555 F. Supp. 3d at 1171. As *Begay* notes, under this provision, "if a physician-applicant has a restricted license, then he or she is not to be hired without an exception from the Area Director." *Begay*, 2016 WL 6394925, at * 31. Although dismissing the remainder of the plaintiffs' credentialing claims under the discretionary function exception, the court in *Begay* allowed the plaintiffs to proceed on "a very narrow claim based on [this] one section of the IHM." *Id.*; *accord Tolbert*, 555 F. Supp. 3d at 1171.

The fact that § 3-1(4)(C)(5) allows for the Area Director to make an exception on a case-by-case basis – ostensibly using their judgment to do so – calls into question the mandatory nature of this credentialing rule. It is not evident that a rule can be considered mandatory when, rather than being applied uniformly across the board, it is subject to the judgment of an individual director on a case-by-case basis. Even assuming, however, that this provision imposes a mandatory, non-discretionary policy as to who may be granted staff membership or clinical privileges, this provision cannot provide the evidence necessary for Plaintiffs to succeed at step one of the *Berkovitz* test. Plaintiffs have unequivocally alleged that "[a]t all material times, Defendants Suzanne Attebery, D.O., Robert Mills, RN, Reanne Irvin, RN, and Raquel R. Ramal, RNC-MNN were licensed to practice in their specialties at Northern Navajo Medical Center." Doc. 3 ¶ 59. Accordingly, there is no allegation here that NNMC's negligence in privileging and credentialing its medical staff involved a violation of § 3-1(4)(C)(5). Because Plaintiffs do not refute that the doctors and nurses at issue here possessed valid licenses, they have not stated a negligent privileging and credentialing claim based on § 3-1(4)(C)(5).

Beyond § 3-1(4)(C)(5), the IHM contains no provisions regarding privileging and credentialing that give specific direction in a way that would make those acts non-discretionary.

30

*Hurst*, 2018 WL 10529521, at *2. Specifically, the IHM directs that "[c]linical privileges are granted by the governing body after consultation with discipline-specific staff or consultants, as appropriate . . . The granting of privileges must reflect the training, experience, and qualifications of the applicant as they relate to the staffing, facilities, and capabilities of the facility." Doc. 32-2 at 6 ((I.H.M. § 3-1.4(F)). Although this provision uses the word, "must," it does not mandate any method by which NNMC is to ensure that the granting of privileges reflects the enumerated criteria. In other words, "it leaves the decision of how to implement this goal to the individual entity," and thus "involves an element of judgment or choice." *Blackburn*, 2021 WL 4440475, at *5. Save for the inapplicable § 3.1(4)(C)(5), the provisions of the IHM relating to privileging and credentialing "give[] hiring and retention guidance, [but] those decisions remain a matter of judgment and choice with the health facility." *Hurst*, 2018 WL 10529521, at *2.[1]

Plaintiffs also cite to 42 U.S.C. § 233(h)(1), which establishes a requirement that clinics "implement appropriate policies and procedures to reduce the risk of malpractice and the risk of lawsuits arising out of any health-related functions performed by the entity." This provision, however, "is not a specific and mandatory directive," as it "leaves the decision of how to implement this goal to the individual entity." *Blackburn*, 2021 WL 4440475, at *5.

Further, Plaintiffs cite to and attach a September 2005 edition of the Indian Health Service Medical Credentialing and Privileging Guide ("IHS Guide"). Doc. 29-7. The IHS Guide,

---

[1] Further, even accepting as true Plaintiffs' allegation that NNMC "negligently performed" the credentialing and privileging of its medical staff, Doc. 29 at 24, this fact is irrelevant to the applicability of the discretionary function exception. This exception applies "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Thus, the Court may not consider whether NNMC performed its credentialing and privileging decisions negligently in deciding whether the discretionary function exception applies. *Duke*, 131 F.3d at 1410.

however, contains the following language: "This guidebook is meant to be a resource manual, not a statement of IHS policy." Doc. 32-2 at 2. Moreover, the IHS Guide contains the following non-mandatory language regarding privileging: "Contract, consultant, and *locum tenens* providers should be privileged by the same mechanisms as other providers when they practice inside the IHS facility." Doc. 29-6 at 2. Thus, the IHS Guide provides no specific and mandatory directives that Defendants allegedly violated in privileging and credentialing its medical staff.

Nor do the federal statutory and regulatory provisions cited by Plaintiffs provide any such specific and mandatory directives. *See* 42 C.F.R. § 482.22(c)(6) (requiring medical staff to adopt and enforce bylaws that include "criteria for determining the privileges to be granted to individual practitioners and a procedure for applying the criteria," but leaving discretion as to the text of the bylaws, the criteria to be set, and the procedure for the application thereof); 42 C.FR. § 482.12(a)(6) (requiring the governing body of the medical staff to "ensure the criteria for selection are individual character, competence, training, experience, and judgment," but leaving to the governing body discretion to evaluate those subjective criteria); 42 U.S.C. § 482.12(a)(6) (requiring that patient care be "provided by or in accordance with the orders of a practitioner who meets the medical staff criteria and procedures or the privileges granted, who has been granted privileges in accordance with those criteria by the governing body, and who is working within the scope of those granted privileges," but not mandating how privileges are to be granted or the criteria therefor). Under Tenth Circuit precedent, the "broad statutory duties" set forth in these statutory provisions do not "prescribe a specific and mandatory course of conduct." *Blackburn*, 2021 WL 4440475, at *5.

Plaintiffs cite to the deposition testimony of an individual provided in a separate, unidentified legal matter, to support their otherwise unsupported argument as to the mandatory

32

nature of these statutes and regulations. But "Plaintiffs have not provided, nor has the Court found, any case in which a court has concluded from *only* deposition testimony that a mandatory directive prescribed—or proscribed—certain conduct by a Government actor." *Jahr v. United States*, 259 F. Supp. 3d 1158, 1164 (W.D. Wash. 2017) (emphasis in original).

Plaintiffs' reliance on the Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission") is also unavailing. The Joint Commission is "an independent, not-for-profit organization," and "health care organizations, programs, and services voluntarily pursue accreditation and certification." Doc. 32 at 9 n.4. The version of the IHM in effect during the relevant period provides that "[e]ach medical staff member who provides medical services must meet the medical staff credentialing and privileging standards of a nationally recognized accrediting/certifying body *such as* the Joint Commission, the American Association for Ambulatory Health Care, or the Centers for Medicare and Medicaid Services." Doc. 32-1 at 5 (IHM § 3-1.3(A)) (emphasis added). Accordingly, the IHM does not specifically require compliance with the Joint Commission's standards. In any event, Plaintiffs do not point to any standards of the Joint Commission that NNMC violated in credentialing and privileging its medical staff.

Finally, Plaintiffs cite to a provision of the New Mexico Administrative Code. Plaintiffs, however, can overcome the discretionary function exception at step one of the *Berkovitz* test only where "a *federal* statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Kiehn*, 984 F.2d at 1102 (emphasis added). New Mexico statutory provisions thus are not a proper basis to challenge the discretionary nature of the government's privileging and credentialing decisions. *See Miller v. United States*, 992 F.3d 878, 886 (9th Cir. 2021) (holding that *Berkovitz* makes clear that "a plaintiff cannot rely on the premise that state

33

law specifically prescribes a course of action for an employee to follow" in challenging the application of the discretionary function exception).

In summary, Plaintiffs have not identified any "discretion-constraining regulation or policy" that NNMC violated in privileging and credentialing the medical staff at issue in this case. *Sydnes*, 523 F.3d at 1185; *accord Tolbert*, 555 F. Supp. 3d at 1171 (finding, in medical malpractice case analogous to the instant one, that the statutes and regulations to which plaintiffs cited, other than IHM § 3-1(4)(C)(5), "do not avoid the discretionary-function exception, because they involve the consideration of alternatives, the weighing of factors, or the application of policy priorities bounded by practical concerns, such that the language leaves to the decisionmaker's discretion how best to fulfill the regulations"). Plaintiffs thus fail to establish at step one of the *Berkovitz* test that NNMC's privileging and credentialing decisions were non-discretionary.

Plaintiffs do not address the second step of the *Berkovitz* test in their response brief and thus do not provide any basis for the Court to find at this second step that the nature of NNMC's privileging and credentialing decisions were not "the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 329. As noted above, this Court must presume that NNMC's discretionary privileging and credentialing decisions are "grounded in policy" unless Plaintiffs come forward with "facts showing that the [decisions] were actually not policy-oriented." *Hardscrabble Ranch*, 840 F.3d at 1222. Plaintiffs have not met this burden. Decisions as to what privileges and credentials to grant to medical staff at an IHS facility fall easily within the category of employment decisions that the Tenth Circuit has held to be "precisely the types of administrative action the discretionary function exception seeks to shield." *Sydnes*, 523 F.3d at 1185-86; *see also Two Eagle*, 2022 WL 1243883, at *10

34

("[S]taffing and operating procedures of an IHS clinic are administrative decisions grounded in economic, social, or political policies that are shielded by the discretionary function exception."). The Court thus finds that Plaintiffs have failed to meet their burden of establishing at step two of the *Berkovitz* test that the discretionary judgment inherent in NNMC's privileging and credentialing decisions is not "the kind that the discretionary function exception was designed to shield." *Kiehn*, 984 F.3d at 1102. Because the discretionary function exception thus applies, this Court lacks jurisdiction to consider Plaintiffs' claims of privileging and credentialing.

       E.      <u>Punitive Damages</u>

In the FAC, Plaintiffs seek punitive damages for Defendants' "reckless disregard for the safety of Baby Jackson [] and Mrs. Srader." Doc. 3 ¶ 41. The FTCA, however, explicitly states that the United States "shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. The Supreme Court has interpreted this provision to bar the recovery of "what are *legally* considered 'punitive damages' under traditional common-law principles," *i.e.*, damages whose "recoverability [] depend[s] upon [] proof that the defendant has engaged in intentional or egregious misconduct" and where the purpose is "to punish." *Molzof v. United States*, 502 U.S. 301, 312 (1992) (emphasis in original). "Under New Mexico law, punitive damages may be awarded only when the conduct of the defendant may be said to be malicious, willful, reckless, wanton, fraudulent or in bad faith and are 'awarded for the limited purposes of punishment and to deter others from the commission of like offenses.'" *Hernandez v. United States*, No. 21-CV-0738, 2022 WL 376318, at *2 (D.N.M. Feb. 8, 2022) (quoting UJI 13-1827 NMRA). Accordingly, punitive damages under New Mexico law – and the punitive damages Plaintiffs seek for Defendants' "reckless disregard" – fall squarely within the category of punitive damages barred by § 2674.

Plaintiffs concede that "the FTCA does not allow punitive damages to be paid by a federal entity." Doc. 29 at 32-33. Nonetheless, Plaintiffs insist that the government "should be subject to punitive damages for its utter indifference in properly staffing and managing its Indian Health Service hospitals, including NNMC." *Id.* Without explanation or analysis, Plaintiffs contend that § 2674's prohibition on punitive damages is "an unconstitutional limitation on the United States' liability." *Id.* at 33. "Plaintiffs neither cite which constitutional provision 28 U.S.C. § 2674 allegedly violates, nor provide any supporting caselaw." *Tolbert,* 555 F. Supp. 3d at 1173 (addressing and rejecting identical argument made by counsel for Plaintiffs herein in a similar FTCA case). Further, "[p]unitive damages have their critics and, if anything, the Constitution restrains punitive damages rather than protecting [them]." *Id.* (collecting cases).

In any event, this Court cannot accept Plaintiffs' invitation to commit reversible error. Because the FTCA, as interpreted by the Supreme Court, expressly prohibits recovery for precisely the punitive damages requested here, this Court lacks subject matter jurisdiction over Plaintiffs' request to recover punitive damages from the government. To the extent that the FAC seeks such damages against the Unites States, it must be dismissed pursuant to Rule 12(b)(1).

F.     Applicability of the NMMMA Damages Cap

In the FAC, Plaintiffs assert that the NMMMA damages cap should not be applied to damages recovered from the government for the negligence of its employees at NNMC. Doc. 3 ¶¶ 68-70. Plaintiffs acknowledge that this assertion is "contrary" to "applicable case law." Doc. 29 at 33. Indeed, in *Haceesa*, the Tenth Circuit reversed this Court's ruling that New Mexico's $600,000 recovery cap was inapplicable to a suit brought against the government under the FTCA for the negligence of a nurse and health care administrators at the Northern New Mexico Navajo Hospital in Shiprock. 309 F.3d at 729-30. In finding this Court's decision erroneous, the

36

Tenth Circuit held that, "because an analogous suit against a private hospital based on the actions of employees who are not themselves health care providers would be subject to the recovery cap, the Plaintiff's present FTCA suit against the Government is also subject to the $600,000 cap." *Id*. *Haceesa* is indistinguishable from the instant case. Accordingly, this Court would commit reversible error if it acceded to Plaintiffs' request that it find the NMMMA recovery cap inapplicable here.

The Court is required by *Haceesa* to apply the $600,000 recovery cap to any damages recovered from the government. Accordingly, to the extent that the FAC seeks damages above that cap from the Unites States, it must be dismissed for lack of jurisdiction pursuant to Rule 12(b)(1).

II.    Nurse Mills's Motion

Given the absence of enumerated counts or causes of action in the FAC, it is difficult to determine with certainty which claims Plaintiffs intend to assert against Nurse Mills, who is "a contract nurse working at NNMC." Doc. 50 at 4 n.1. Based on the allegations and assertions in the FAC, the Court interprets the FAC to assert against Nurse Mills a wrongful death claim on behalf of Jackson's Estate, loss of consortium claims on behalf of Mrs. Srader, Mr. Srader, and R.S., and a personal injury claim on behalf of Mrs. Srader, and to seek to recover punitive damages from him. *Id.* at 4. As noted above, the government did not move to substitute the United States as a defendant for Nurse Mills as it did for Dr. Moore, Dr. Attebery, and Nurse Irwin. Accordingly, Plaintiffs' claims are asserted against Nurse Mills as pendent state law claims. Nurse Mills seeks dismissal of these claims on the basis that the FAC fails to meet the fair notice standard set by Rule 8(a) of the Federal Rules of Civil Procedure. Nurse Mills also seeks dismissal of the wrongful death claim for the additional reason that the FAC fails as a

37

matter of law to state a wrongful death claim.

First, as to the wrongful death claim, the Court agrees that Plaintiffs have not, and cannot, state a claim upon which relief can be granted. As explained above, New Mexico's Wrongful Death Act is "the exclusive remedy governing wrongful death actions in New Mexico." *Romero*, 872 P.2d at 845. Also as explained above, under that Act, "no cause of action exists for the wrongful death of a nonviable fetus." *Miller*, 905 P.2d at 195. Rather "[a]n independent wrongful death action for the death of a fetus requires a showing of viability at the time of injury." *Id.* Here, the facts as alleged by Plaintiffs establish that Jackson was a "previable," rather than a viable, fetus on May 19, 2020, when Mrs. Srader sought medical care at NNMC and Dr. Moore performed the manual aspiration of Mrs. Srader's uterus. Doc. 3 ¶¶ 7, 25-26. Accordingly, as a matter of law, Plaintiffs cannot assert a wrongful death claim based on Jackson's death.

Plaintiffs contend that *Dobbs* allows them to pursue their wrongful death action against Nurse Mills. But as explained above, the Supreme Court's statement in *Dobbs* that legitimate state interests for laws regulating abortions include "respect for and preservation of prenatal life at all stages of development," 597 U.S. at 301, made in the entirely different and unrelated context of giving states the authority to regulate abortions, does not change the fact that New Mexico law does not allow a wrongful death action for a nonviable fetus. As noted above, Plaintiffs provide no explanation for how this statement could or would upend binding New Mexico precedent as to the reach of its Wrongful Death Act. Indeed, also as noted above, the state court has already addressed and rejected this very argument in a state case brought by Plaintiffs against Nurse Mills and Nurse Ramal. *Estate of Jackson Lee Srader, et al. v. Mills, et al.*, No. D-117-CV-2023-00171 (1st Judicial Dist. Ct. Dec. 21, 2023). Plaintiffs provide no basis for this Court to reach a different conclusion on the same claim against the same Defendant

under the same controlling law.

No cause of action exists under New Mexico law for the wrongful death of a nonviable fetus. Jackson was a nonviable fetus at the time of his injury. Accordingly, Plaintiffs' wrongful death claim asserted against Nurse Mills fails as a matter of law and must be dismissed pursuant to Rule 12(b)(6).

Next, the Court agrees with Nurse Mills that the FAC fails to meet the Rule 8 pleading standard with regard to his alleged liability. Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This requirement ensures that "the defendant [has] fair notice of what the . . . claim is and the grounds upon which it rests." T*wombly*, 550 U.S. at 555. As noted above, the Tenth Circuit has interpreted Rule 8 to require that a complaint "make clear exactly who is alleged to have done what to whom." *Robbins*, 519 F.3d at 1248. Thus, a complaint must state "the facts that support the claims," making clear "what each Defendant did to Plaintiff, when each Defendant did it, [and] how each Defendant's actions harmed . . . Plaintiff." *Martinez v. ABQ Code Enforcement*, 25-CV-600, 2025 WL 3754135, at *3 (D.N.M. Dec. 29, 2025). Allegations that "do not properly allege personal participation of the individual defendants [] do not provide sufficient 'fair notice' of what the . . . claim is against them 'and the grounds upon which it rests.'" *Cohen v. Howard*, No. 23-CV-2104, 2024 WL 2137944, at *8 (D. Colo. Apr. 2, 2024) (quoting *Twombly*, 550 U.S. at 555).

Here, the FAC fails to include any allegations of personal participation by Nurse Mills in the events underlying Plaintiffs' claims. There are no factual allegations describing what Nurse Mills did, to whom he did it, when he did it, or the harms to Plaintiffs that he caused. As described above, the only individuals at NNMC identified by Plaintiffs as having seen, spoken

to, or treated Mrs. Srader are Dr. Attebery, Dr. Moore, and Nurse Ramal. Plaintiffs do not allege any interactions between Mrs. Srader and Nurse Mills, or any actions taken or omissions made by Nurse Mills; nor do they provide any factual basis to establish his role in, or responsibility for, any part of the chain of events on which Plaintiffs' claims are based. In short, the FAC attributes no specific conduct to Nurse Mills. *See Cohen*, 2024 WL 2137944, at *8. Accordingly, the FAC provides no factual basis to support Plaintiffs' claims that Nurse Mills was one of the employees and contractors of NNMC who caused Mrs. Srader's "traumatic pain [and] suffering" and the "unnecessary death of the Srader's unborn baby," failed to "conduct any laboratory studies, fetal heart tones or ultrasound," and "did not possess or apply the knowledge and use the skill and care ordinarily used by reasonably well-qualified health care providers of the same field of medicine practicing under similar circumstances, giving due consideration to the locality involved, thus breaching their duty to their patients Mrs. Srader and Baby Jackson []." Doc. 3 ¶¶ 2, 9, 47. The FAC thus fails to provide Nurse Mills with fair notice as to basis of the claims asserted against him and, accordingly, runs afoul of Rule 8.

In their response brief filed in opposition to Nurse Mills's Motion, Plaintiffs attempt to cure these pleading deficiencies by stating that Nurse Mills "treated Jennifer Srader on May 19, 2020," and that he "noted Jennifer Srader arrived with a possible miscarriage" and complained "of mild to moderate lower abdominal pain and vaginal bleeding." Doc. 53 at 2. The Court need not decide whether these statements would be sufficient to cross the line between possibility and plausibility of entitlement to relief, as Plaintiffs' "attempt to remedy [their] pleading deficiencies through a response to a motion to dismiss is futile." *Walz v. California*, No. 25-CV-00004, 2025 WL 1685798, at *5 (D. Utah May 30, 2025) "[I]t is a 'well-established' principle 'that in determining whether to grant a motion to dismiss, the district court . . . [is] limited to assessing

40

the legal sufficiency of the allegations contained within the four corners of the complaint.'" *Id.* (quoting *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995)). Accordingly, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Id.* (citations omitted). Plaintiffs' attempt to describe, in their response brief, Nurse Mills's involvement in the events underlying Plaintiffs' claims thus does not serve to remedy the pleading deficiencies described herein.

Dismissal of the FAC as to Nurse Mills under Rule 12(b)(6) for failure to comply with Rule 8 thus is appropriate. Nonetheless, the Court will allow Plaintiffs 60 days to file a motion for leave to amend Mrs. Srader's personal injury claim and Plaintiffs' loss of consortium claims against Nurse Mills, which motion must attach a proposed amended complaint. If Plaintiffs choose to file a motion for leave to amend, and Nurse Mills does not consent in writing thereto, it will be "within the discretion of the Court to grant or deny leave to amend." *Foman v. Davis*, 371 U.S. 178, 182 (1962). While the Court should "freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), the Court may refuse leave to amend "upon a showing of undue delay, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or futility of amendment." *Castleglen, Inc. v. Resolution Tr. Corp.*, 984 F.2d 1571, 1585 (10th Cir. 1993) (citing *Foman*, 371 U.S. at 182). Notably, "[a] proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230 (10th Cir. 2017) (quoting *Barnes v. Harris*, 783 F.3d 1185, 1197 (10th Cir. 2015)).

If their proposed amended complaint contains the same deficiencies identified herein, Plaintiffs' motion for leave to amend will be denied. Plaintiffs are reminded that an amended complaint must provide factual allegations regarding Nurse Mills's personal participation in the

41

events underlying Mrs. Srader's personal injury claims and Plaintiffs' loss of consortium claims, identifying what Nurse Mills did, when he did it, and how his actions caused the specific harms suffered by each Plaintiff. If Plaintiffs continue to assert that Nurse Mills "did not possess or apply the knowledge and use the skill and care ordinarily used by reasonably well-qualified health care providers of the same field of medicine practicing under similar circumstances, giving due consideration to the locality involved," they must set forth factual allegations to support this assertion. If Plaintiffs do not timely file a motion to amend, Nurse Mills will be dismissed as a Defendant from this matter.

## CONCLUSION

Mrs. Srader's personal injury claim and Mrs. and Mr. Srader's loss of consortium claims against the United States will not be dismissed and they may pursue those claims against the United States. The remainder of Plaintiffs' claims against the United States will be dismissed for lack of subject matter jurisdiction, for the reasons set forth above. Plaintiffs' claims against Nurse Mills will be dismissed for failure to state a claim, for the reasons set forth above. With respect to Mrs. Srader's personal injury claim and Plaintiffs' loss of consortium claims, Plaintiffs will be given 60 days within which to file a Rule 15 motion for leave to amend as against Nurse Mills.

**IT IS THEREFORE ORDERED** that Defendant United States' Motion to Dismiss in Lieu of Answer [Doc. 13] is **GRANTED in part and DENIED in part**, as follows: (1) Mrs. Srader's personal injury claim is not dismissed and may proceed; (2) the Estate of Jackson Lee Srader's wrongful death claim is dismissed pursuant to Rule 12(b)(1); (3) Mrs. Srader and Mr. Srader's loss of consortium claims are not dismissed and may proceed; (4) R.S.'s loss of consortium claim is dismissed pursuant to Rule 12(b)(1); (5) Plaintiffs' negligent hiring, training,

supervision, credentialing, and privileging claims are dismissed pursuant to Rule 12(b)(1); (6)

Plaintiffs may not recover punitive damages from the government; and (7) the NMMMA

damages cap applies to any recovery from the government.

**IT IS FURTHER ORDERED** that Defendant Robert Mills, RN's Motion to Dismiss in

Lieu of Answer [Doc. 50] is **GRANTED,** as follows: (1) Plaintiffs' claims against Nurse Mills

are dismissed in their entirety pursuant to Rule 12(b)(6); and (2) Plaintiffs have 60 days within

which to file a Rule 15 motion for leave to amend, but their proposed amended complaint may

contain only a personal injury claim on behalf of Mrs. Srader and loss of consortium claims.

DATED this 27th day of April 2026.

_____

MARTHA VAZQUEZ
Senior United States District Judge